Burket, J.
The whole case turns upon the single question, whether or not the appointment of Mr. Heckman as guardian of the estate of Mrs. Adams, was void or valid.
Mr. Adams and his wife were married, and the property in controversy acquired, while section 3108, of the Revised Statutes, as amended April 16, 1885, and section 3109, as amended April 14, 1884, were in force.
Section 3108, provides as follows:
“ Any estate or interest, legal or equitable, in real or personal property, including rights in action, belonging to a woman at her marriage, or which may come to her during coverture, by conveyance, gift, devise or inheritance, or by purchase with her separate money or means, or due as the wages of her personal labor, or growing out of any viola *311 tion of her personal rights, shall, together with the rents, incomes, issues and profits thereof, be and remain her separate property.” There is a further provision in this section as to his curtesy in her real estate, and as to her leasing the same, but nothing further as to personal estate.
Section 3109, is as follows:
■ “The separate property of the wife shall be under her-sole control, and shall not be taken by any process of law for the debts of the husband, or be in any manner conveyed or incumbered by him, and she may, in her own name, during coverture, contract to the same extent and in the same manner as if she were unmarried.”
Under and by virtue of these two sections, the separate property of the wife belongs to her in her own right, and is under her sole control, and the husband as such, has no interest in or control over the same.
As to the wife’s separate property, the husband stands as a stranger to her. While the case of Levi v. Earl, 30 Ohio St. 147, has been overruled as to another point, it has never been doubted as to the point here in question. In that case this court held that the separate property of the wife, as fixed by the married woman’s act of 1861, as amended in 1866, became by virtue of that statute her separate property and under her sole control, “free from the marital rights of the husband at common law over the same.” And' this court further held in the same case that, “ By these statutes the marital rights of the husband were divested as to the wife’s general estate, and the wife was invested with the control of the same,” In the case of Patten v. Patten, 75 Ill., 446, the court says: “The effect of the married woman’s act is such that the rights of the husband at common law, in respect to the wife’s property, are swept away and gone. As to her separate estate, and her relations thereto, she has no husband, and he is as to such estate, even during coverture, a stranger.”
Of course, these statutes as to the rights of married women, do not affect or change the common law rule, that in the absence of the husband, the wife is his agent for the care and protection of his property. And as a necessary *312 result of these statutes the husband is now held, in the absence of the wife, to be her agent for the care and protection of her property. While thus acting fpr her in her absence, his rights and relations to her property are the same as hers were to his property, at common law, under the same circumstances.
The legal effect of the statutes as to the property rights of married women is to place husband and wife upon an exact equality as to the property of each, that is, “ Neither husband nor wife has any interest in the property of the other,” except as to dower, distribution and support. It therefore follows that Mr. Adams had no interest in or control over the property of his wife as against her or her representative. Mr. Pleckman claimed to be her representative, her guardian, and Mr. Adams claimed that the appointment of Mr. Heckman as guardian of Mrs. Adams was void, for the reason that Mr. Adams had no notice of the application for the appointment of a guardian for his wife; and he offered on the trial to prove that he had nO' such notice. The court refused to admit the testimony on that point, and exceptions were duly taken. The court also charged the jury that if Mr. Heckman was appointed and qualified as guardian of Mrs. Adams, that he was entitled as such guardian to the property in controversy; and had the right to take the property from the possession of any person who refused to deliver the same to him on demand; to which charge exceptions were taken by Mr. Adams.
The appointment of Mr. Heckman as guardian of Mrs. Adams, was for her estate only, and not for her person and estate; and it is claimed that under section 6302 there is no authority for the appointment of a guardian of the estate only of a lunatic.
. Section 6304 provides that: “All laws relating to guardians for minors and their wards, * * in force for the time being, shall be applicable to guardians for * * lunatics * * except as otherwise specially provided.”
Section 6255 was in force for the time being at the time of this appointment, and that section provides that: “ A *313 guardian may be appointed to take charge only of the estate of a minor.”
The appointment of a guardian for the estate only of a lunatic, it will thus be seen, is authorized by the letter of these two sections of the statute.
Section 6302 is made up in the revision of 1880, out of sections 41, 43 and 44 of the act of April 7, 1856. Section 41 provides that the probate judge upon satisfactory proof that any person resident of the county, is an idiot or lunatic, and that it is necessary in order to preserve the property of such idiot or lunatic, shall appoint a guardian.
Section 43 was in the same words except that the words, “ and that it is necessary in order to preserve the property” were omitted.
The guardian to be appointed under section 41 was for the preservation of the property, that is of the estate only, while the appointment under section 43 was general, for both person and estate.
As these two sections are now combined into one (6302) the new section must be construed to be as broad as both of the old ones taken together. The new section is more general in its terms, but not more narrow in its provisions.
In the case of King v. Bell, 36 Ohio St. 460, this court held, that all laws relating to guardians for minors and their wards are made applicable to guardians for lunatics.
True, the question as to appointing a guardian for the estate only of a lunatic, did not arise in that case; but the question as to whether the appointment of the guardian for the lunatic, who was also a minor in that case, was, or was not, authorized by said section 6304, was directly in question, and said section was held to be applicable, and to give such authority.
In the case of Martin L. Leffel v. Henry C. Knoop, decided at the present term of this court, and not reported, this court held, that sections 6304 and 6255 applied to the appointment of guardians for lunatics, and that such guardians might be appointed for the estate only. We still regard that decision correct, and therefore hold that the statute *314 authorizes the appointment of a guardian for the estate only of’ a lunatic or insane person.
What now forms section 6302, of the Revised Statutes, was, before the revision of 1880, a part of the chapter on lunatic asylums, and said section must still be read and construed in pari materia with the. sections providing for the admission of persons to the lunatic asylum.
By sections 702 and 703, of the Revised Statutes, it is provided, that upon an affidavit being filed by some resident citizen with the probate judge, to the effect that he believes the person charged with insanity to be insane, the probate judge shall issue his warrant for such person, and have such person brought before him, on a day to be named in the warrant, and witnesses shall be subpoenaed, and an inquest of lunacy held upon the person, and if the person cannot be present before the court, the judge shall personally visit the patient, and certify that he has ascertained the condition of the person by actual inspection, and thereupon the inquest of lunacy may proceed in the absence of such person.
By section 704, it is provided, that if upon the hearing the probate judge is satisfied that the person so charged is insane, he shall cause the proper certificate to be made out.
By section 705, the judge is required to issue his warrant to the sheriff, commanding him to take charge of, and convey such insane person to the asylum. Upon being received at the asylum the superintendent is required to receipt for the patient on the back of the warrant, and the sheriff is required to return the warrant so receipted to the probate judge.
In case the patient can not be admitted to the asylum he may be confined in the infirmary or county jail, and all things needful, if not otherwise provided, shall be paid for out of the county treasury on the warrant of the probate judge. Should such insane person be restored to reason, the probate judge may upon the proper certificate of the attending physician release such person.
By section. 709, the superintendent of the asylum is authorized, when he deems it proper, to discharge such patient from the asylum; and if the superintendent deems *315 it proper to allow such patient to leave the asylum unattended, he may do so; but otherwise the superintendent notifies the probate judge, and the patient is conveyed to his or her home upon the warrant of the probate judge. Such insane person may also be allowed to make a trial visit to his or her home for a period not exceeding ninety days, but such visit and return to the asylum is under the supervision of the probate judge.
By section 710 it is provided that upon the return of an escaped patient, or the discharge of a patient from the asylum, the superintendent shall at once notify the probate judge.
By section 714 the probate judge is required in all cases to file and preserve all papers left with him, and make such entries upon'his docket, as will, together with the papers so filed, preserve a perfect record of each case.
From these, and other provisions of the statute, it is clear that the probate judge upon an inquest of lunacy obtains jurisdiction of the person of the patient, and that such jurisdiction continues until the patient is finally discharged. The status of the patient, as being insane and a fit person for guardianship, is fixed by the finding of the probate judge upon the inquest of lunacy, and such status continues until it is changed by the discharge of the patient; and any time before such discharge, the probate judge is authorized by section 6302 to appoint a guardian for such insane person. The statute seems to contemplate the appointment of a guardian immediately upon the status of insanity being fixed, but delay in the appointment could not have the effect to take away the jurisdiction of the probate court, so long as the delay is not extended beyond the discharge of the patient. The time of making such appointment of guardian, or whether there is any necessity for an appointment at all, or not, is largely in the discretion and sound judgment of the probate judge.
Was the appointment of Mr. Heckman as guardian for Mrs. Adams void, for the reason that it was made without notice to her husband? Mr. Adams had notice of the inquest of lunacy, and conveyed his wife to the asylum, under *316 the warrant of the probate judge; and also brought her back not discharged, and left her at her father’s house. He therefore had notice of the status of insanity of his wife, and that she was a fit subject for guardianship. The statute, as it stood when this appointment was made, did not re■quire any notice to any person of the application for guardianship of a person adjudged insane by the probate court. And this court held in Leffel v. Knoop, supra, that no notice to the patient was necessary in such case.
As the patient is the owner of her own property, and as this property can be placed in the hands of a guardian without notice to her, we see no good reason why the husband, who has no interest in, or control over her property, should have notice. If it be said that the guardian of the wife might invade the household of the husband, and despoil it of the furniture and household goods, the answer is, that at common law, the guardian of the insane husband appointed without notice to the wife, might do the same thing as against the wife; and what then had to be endured by her, should not now be complained of by him. Husband and wife are put upon an exact equality as to their property rights, even to the extent that neither can be excluded from the other’s dwelling;' and while he is to support himself and his wife, if he is unable to do so, she must assist him so far as she is able. Sections 3110 and 3111, Rev. Stat.
Suppose a judgment should be rendered against the wife without notice to the husband, could it be claimed that the sheriff holding an execution against her, would be required to notify the husband before seizing the wife’s property to satisfy the execution? We think not.
Many cases, of which Eslava v. Lepretre, 21 Ala., 504, is a fair sample, hold that an inquisition of lunacy followed by the appointment of a guardian, all without notice to the alleged lunatic, is void. But in all such cases the decision is put upon the ground that the status of the person cannot be changed from sound mind to lunacy without notice to such person. But the status of lunacy being once fixed by a proper inquisition, the right to appoint a guardian with *317 out further notice seems to be conceded. McCurry v. Hooper, 12 Ala., 823; Wait v. Maxwell, 5 Pick., 217.
The case of Shroyer v. Richmond, 16 Ohio St. 455, is a very important case upon the point in question, and being in our own state, and under a statute the same in effect as the one now in force, it should have great weight, and be practically conclusive of this case. The proceeding in that case was to. appoint a guardian for a mute under section 17 of the act of March 9, 1838 (S. & C. 679), which was a part of the act regulating lunatic asylums, and which act then contained the same provisions for appointing guardians for lunatics, as is now contained in section 6302 of Revised Statutes. Said section 17 of the act of 1838 provides that the court “shall have power to appoint guardians to all such deaf and dumb persons of'full age, who may prove to be incapable of taking charge of their affairs.” On December 6, 1860, the probate court of Montgomery county appointed David Shroyer guardian of Harry Eong under said act of 1838, describing said Dong as a “mute;” and the only entry on the journal of the probate court as to the facts constituting jurisdiction are as follows: “This day came David Shroyer and made application to be appointed guardian of Harry Dong (a mute), and the court being satisfied that said Harry Long is a mute, and that said mute is a resident of this county.” Then follows a statement on the journal to the effect, that having filed the proper statement as to the value of the estate, said Shroyer gave bond and was appointed guardian, and took the oath of office. Afterward, in a litigation, the validity of this appointment as guardian was called in question; and it was claimed that the appointment was void, for the reason that the court did not acquire jurisdiction, and did not find that said Harry Eong at the time of the appointment, belonged to a class of persons over whose estate the court had jurisdiction to appoint a guardian, and averred that said Harry Eong at the time of the appointment did not belong to any class of persons over whom the court had jurisdiction to appoint a guardian, and further averred that the appointment was made without authority of law. A demurrer to this answer was over *318 ruled, and on the trial parol evidence was received to prove the facts set forth in the answer, and the verdict was against the guardian; to all of which he excepted. The case was reserved to this court, and the following are the 5, 6 and 7 syllabi of the case:
“5. Such proceedings are not inter partes, or adversary in their character. They are, properly, proceedings in rem; and the order of appointment, made in the exercise of jurisdiction, binds all the world. The actual presence of the ward is not essental to the jurisdiction; unless, by reason of his right to choose a guardian, or for other cause, the statute so require.”
“6. The probate courts of this state are, in the fullest sense, courts of record; they belong to the class whose records import absolute verity, that are competent to decide on their own jurisdiction, and to exercise it to final judgment, without setting forth the facts and evidence on which it is rendered.”
“7. Hence, an order appointing a guardian, made by a probate court, in the exercise of jurisdiction, cannot be, collaterally, impeached. The record showing nothing to the contrary, it will be conclusively presumed, in all collateral proceedings, that such order was made upon full proof of all the facts necessary to authorize it.”
This case is cited and approved in Wheeler v. State, 34 Ohio St. 394, in which the court say: “Inquests of this character (lunacy) are analagous to proceedings in rem, affecting the general and public interest, and no one can strictly be regarded as a stranger to them.” This case is also cited in Knapp v. Thomas, 39 Ohio St. 387, where Judge Okey says: “The record of the probate court appointing a guardian is, in all collateral proceedings, conclusively presumed to be correct.” This case of Shroyer v. Richmond, is cited and approved in Slagle v. Entrekin, 44 Ohio St. 637, and in Railroad v. Belle Centre, 48 Ohio St. 273, and in several other cases. In the case in 48 Ohio St., the same question was made as to want of notice, that is made in the case at bar, and an effort was made to impeach the judgment of the probate court, collaterally, by *319 showing by parol, that no notice was served on the railroad company in the appropriation case in the probate court. This court held that such evidence could not be received, and that the judgment of the probate court must be held, in a- collateral proceeding, to be conclusive.
In view of these authorities, it is clear that as between Mr. Heckman and Mr. Adams, in a collateral proceeding, the guardianship was valid, and could not be impeached; and that the court of common pleas properly excluded the evidence offered by Mr. Adams to show ■ that the appointment of the guardian was without notice to him. The record of the probate court bound all the world, including Mr. Adams.
It is also clear that the charge of the court of common pleas was correct, or at least that Mr. Adams could not complain of the same, as it was,- perhaps, more in his favor than the evidence would warrant.- The identity of the parties being admitted, the record of the guardianship was conclusive, and the court should have so instructed the jury, without submitting that question to them for their determination.
The probate court is always open, and under section 6316, of the Reviséd Statutes, a motion can be made at any time for the removal of a guardian improperly appointed, or for other cause; and Mr. Adams should have availed himself of the provisions of this statute, instead of treating the action of the probate court as void.
With the question of the guardianship thus determined, there is no other error in the record of the common pleas court, and it follows that the judgment of the circuit court should be reversed, and that of the common pleas affirmed.

Judgme7it accordingly.